UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Brenda R.,

        Plaintiff,

        v.                                   Civil Action No. 2:13-cv-283-jmc

Commissioner of Social Security,

        Defendant.

## OPINION AND ORDER
(Docs. 34, 35)

Plaintiff Brenda R. brings this action pursuant to 42 U.S.C. § 405(g) of the
Social Security Act, requesting review and remand of the third decision of the
Commissioner of Social Security denying her applications for Disability Insurance
Benefits (DIB) and Supplemental Security Income (SSI).  Pending before the Court
are Plaintiff's motion to reverse the Commissioner's decision (Doc. 34), and the
Commissioner's motion to affirm the same (Doc. 35).  For the reasons stated below,
Plaintiff's motion is DENIED, the Commissioner's motion is GRANTED, and the
Commissioner's decision is AFFIRMED.

## Background

Plaintiff was 32 years old on her alleged disability onset date of February 28,
2007.  She graduated from high school and has held a number of jobs, including as a
housekeeper, a laundry sorter, a waitress, and a cashier.  Her longest period of
employment lasted approximately two years.  Plaintiff has two sons but lost custody
of them years ago due to her drug and alcohol abuse.  She lives alone, has been

homeless at times, and has had multiple residencies at inpatient drug treatment rehabilitation centers and sobriety houses.

Plaintiff has a long history of polysubstance dependence, primarily cocaine and opiates; and she has been incarcerated several times for drug-related offenses. She began abusing alcohol and cannabis at around age 15, around the time when she was sexually abused by her stepfather. She was admitted to Valley Vista, an inpatient drug addiction treatment facility, from November 2004 through January 2005. She had a second stay there from February 2006 through April 2007. Medical notes from this period indicate that Plaintiff was maintaining her sobriety, interacting with her children and with a boyfriend, working three days a week, and attending Alcoholics Anonymous meetings five days a week. In June 2007, however, she was admitted to Rutland Regional Medical Center for treatment of septic shock after injecting Ritalin and cocaine while using a contaminated needle. By the end of July 2007, Plaintiff was feeling better, until she relapsed in September 2007 and was sent to the Dale Correctional Facility after violating the terms of her probation. Eventually, she was transferred to Valley Vista for her third detoxification admission, where she remained until January 2008. A few months later, in March, Plaintiff had another incarceration related to her drug use. She was readmitted to Valley Vista in April 2008 (her fourth and final inpatient stay there), where she resided until July 2008. She appears to have had an extended period of sobriety after that residence, but then tested positive for drugs in November 2009 and admitted to relapses in late 2011 and late 2012.

Plaintiff's medical history includes three head injuries: one occurring in 1994 and the other two occurring in 2001, and all three involving motor vehicle accidents. She also suffers from depression, anxiety, attention deficit hyperactivity disorder (ADHD), and sleep problems.

In December 2008, Plaintiff stated in a Function Report that, on a typical day, she did chores, went to the coffee shop, read, napped, attended medical and counseling appointments, watched television, occasionally went to the library, and sometimes spoke with her children on the telephone. (AR 173, 2091.) Plaintiff testified in May 2013 that her depression was "ruining [her] life" (AR 1679), that she showered only once a week or less, and that her Section 8 apartment was "a mess" because she had no energy to do even simple household chores (AR 1680). In October 2016, Plaintiff testified that she did not want to get out of bed due to her depression, and she often felt too exhausted to attend her counseling appointments. (AR 1811.)

On August 4, 2008, Plaintiff filed applications for SSI and DIB, alleging disability as a result of depression and cognitive problems due to head trauma. She explained that she has "no motivation to do anything except get out of bed." (AR 2073.) She originally alleged disability as of October 1, 1994, but later amended the alleged disability onset date to February 28, 2007. Plaintiff's applications were denied initially and upon reconsideration, and she timely requested an administrative hearing. Her first hearing was held on May 7, 2010 by Administrative Law Judge (ALJ) Thomas Merrill. (AR 26–50.) On August 17, 2010, ALJ Merrill issued a decision finding that Plaintiff was not disabled under the Social Security Act at any

time from her alleged disability onset date through the date of the decision. (AR 7–19.) Thereafter, the Decision Review Board selected the ALJ's decision for review, but did not conduct its review during the time allowed. As a result, the decision became final, and Plaintiff sought judicial review. On April 23, 2012, this Court issued an Opinion and Order remanding Plaintiff's claim for further proceedings and a new decision due to the ALJ's failure to properly apply the treating physician rule. (AR 1018–30.) *See Reardon v. Astrue*, Civil Action No. 2:11-CV-11, 2012 WL 1410354, at *6 (D. Vt. Apr. 23, 2012).

Pursuant to the remand order, on January 16, 2013 and May 6, 2013, respectively, ALJ Merrill held second and third administrative hearings on the claim. (AR 1670–1707, 1731–71.) Plaintiff appeared and testified at both hearings, and was represented by a non-attorney representative. In addition, a vocational expert (VE) testified, and the ALJ employed the assistance of medical expert Dr. Koocher. On June 19, 2013, the ALJ issued a second unfavorable decision. (AR 973–91.) Plaintiff again sought judicial review, filing the Complaint in this matter on October 17, 2013. (Doc. 1.) On November 21, 2014, this Court granted the Commissioner's consented-to motion to remand under sentence six of 42 U.S.C. § 405(g), due to the Commissioner's inability to locate the recording of the January 2013 administrative hearing. (Doc. 24; *see* Doc. 23.)

A fourth and final administrative hearing was held by ALJ Lisa Groeneveld-Meijer on October 25, 2016. (AR 1772–1824.) Plaintiff again appeared and testified, and was represented by a non-attorney representative. In addition, a VE testified at

the hearing, and the ALJ employed the assistance of medical expert Dr. Fuess[1].  On March 1, 2017, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act at any time from her alleged disability onset date of February 28, 2007 through the date of the decision.  (AR 1711–30.)  Because the Court had remanded the matter under sentence six of 42 U.S.C. § 405(g) (*see* Doc. 24), it has retained jurisdiction over Plaintiff's claim.  The Court is now in receipt of the entire administrative record, including the records of each of the four administrative hearings, and the matter is ripe for judicial review.

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings).  20 C.F.R. §§ 404.1520(d),

---

[1] In her motion, Plaintiff refers to the medical expert who testified at the October 2016 administrative hearing as both "Billings S. Fuess" (Doc. 34 at 2) and "Billings Fuchs" (Doc. 34-1 at 10, 15, 20–27), while the Commissioner refers to this medical expert in its motion as "S. Fuess" (Doc. 35 at 3–5, 7–9; Doc. 35-1 at 2).  In the transcript of the hearing, the expert is referred to as "Dr. Foos." (AR 1772, 1784.)  Although unclear which spelling is correct, the Court opts to adopt the spelling used in the Commissioner's brief ("Fuess"), given its similarity with that used in the transcript of the administrative hearing ("Foos") and given Plaintiff's use of that spelling in her reply brief (Doc. 38 at 2 n.1, 5–7).

416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Groeneveld-Meijer first determined that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of February 28, 2007. (AR 1714.) At step two, the ALJ found that Plaintiff had the following severe impairments: an affective disorder, an anxiety-related disorder, ADHD, and "polysubstance dependence with episodes of relapsing and remitting substance use." (*Id.*) Conversely, the ALJ found that Plaintiff's

cognitive deficits due to head trauma were non-severe, given that Plaintiff did not

seek any ongoing treatment of this impairment. (AR 1716.) Nonetheless, the ALJ

noted that she considered and assessed Plaintiff's cognitive deficits in conjunction

with her other mental impairments. (*Id.*)

At step three, the ALJ found that none of Plaintiff's impairments, alone or in

combination, met or medically equaled a listed impairment. (AR 1716–21.) Next, the

ALJ determined that Plaintiff had the RFC to perform "a full range of work at all

exertional levels," except as follows:

> [Plaintiff] is able to perform work activity that is routine day to day with
> simple instructions and few steps (up to a maximum of three). She is
> capable of incidental and superficial interactions with the general public
> should it occur, but interaction with the general public should not be
> required to perform her job duties. Work activity should not be fast-paced,
> meaning no belt-paced work, timed work, or work with strict quotas.
> [Plaintiff] is capable of routine, day-to-day interaction with others. Work
> activity should involve few, if any, changes day[] to[] day.

(AR 1721.) Next, the ALJ found that Plaintiff had no past relevant work because

there was no evidence of any work activity performed by Plaintiff within the past

15 years that rose to the level of substantial gainful activity. (AR 1728.) Finally,

based on testimony from the VE, the ALJ determined that Plaintiff could perform

other jobs existing in significant numbers in the national economy, including the

representative occupations of hand packager, dishwasher, and merchandise marker.

(AR 1729.) The ALJ concluded that Plaintiff had not been under a disability from her

alleged disability onset date of February 28, 2007 through the date of the decision,

March 1, 2017. (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>Analysis</u>

Plaintiff argues that, although she may have been able to engage in routine, day-to-day interactions during the alleged disability period, she could not have held a full-time job because she was unable to interact appropriately when receiving criticism from supervisors; she would have had conflicts with coworkers; and she would have had difficulty in stressful work situations. Plaintiff claims the ALJ made the following errors in her decision to deny disability benefits: (1) affording less weight to the opinions of treating physician Dr. Warnken than to those of medical expert Dr. Fuess and several other non-treating medical consultants; (2) failing to consider Plaintiff's need for frequent absences from work due to treatment and appointments; and (3) failing to ensure that Plaintiff's counsel adequately cross-examined Dr. Fuess at the October 2016 administrative hearing. (*See* Docs. 34-1, 38.) The Commissioner refutes each of these arguments, and asserts that the ALJ's decision is legally sound and supported by substantial evidence. (*See* Doc. 35.)

## I.    ALJ's Analysis of the Medical Opinions

Plaintiff's primary argument is that the ALJ erred in her analysis of the medical opinions, particularly those of Plaintiff's treating physician, Dr. William Warnken. Plaintiff asserts that the ALJ should have given greater weight to

Dr. Warnken's opinions and less weight to the opinions of testifying medical expert Dr. Fuess.

Dr. Warnken was Plaintiff's primary care physician throughout the ten-year period under review (February 2007 through March 2017), treating and prescribing medications for Plaintiff on a regular basis during that period. Dr. Warnken offered five sets of opinions regarding Plaintiff's functional capacity during the alleged disability period: in March 2009 (AR 656–57), April 2010 (AR 831–37), July 2012 (AR 1526–31), July 2013 (AR 2844–45), and August 2016 (AR 2886–89). In April 2010, Dr. Warnken opined that Plaintiff had a "substantial loss of ability" to maintain regular attendance, be punctual, maintain concentration for two-hour periods, accept instructions from supervisors, and respond appropriately to criticism from supervisors. (AR 835.) The Doctor stated: "In a structural setting, [Plaintiff] performs well – however her environment is not structural which contributes to difficulty multi-tasking[] [and] sustaining concentration." (*Id.*) Dr. Warnken reaffirmed that opinion in July 2012 and August 2016 (AR 1526–31, 2886–89), adding that Plaintiff would "cease to function effectively" when confronted with conflicts with coworkers or peers (AR 1527); would "have difficulty responding appropriately" to coworkers, supervisors, the general public, and changes in a routine work setting (*id.*); and would be "off-task" for more than 20% of an eight-hour workday (AR 2888). In July 2013, recording that Plaintiff was "frustrated with disability decisions" (AR 2841) and "[g]etting distracted easily" (AR 2843), Dr. Warnken opined in a treatment note that Plaintiff "cannot work as a cafeteria worker, landscaper, etc.,"

and that Plaintiff's "situation is much more complicated given [her] history of head trauma." (AR 2844.) The Doctor also stated in the treatment note that he "disagree[d]" with Plaintiff's June 2008 Neuropsychological Evaluation, which found that Plaintiff's overall intellectual functioning was intact. (AR 2845; *see* AR 377–78.)

The ALJ was required to analyze Dr. Warnken's opinions under the "treating physician rule," given his status as Plaintiff's treating physician during the alleged disability period. Under that rule, a treating source's opinion on the nature and severity of the claimant's condition is entitled to "controlling weight" if it is "well[] supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2)[2]; *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993). When, however, as here, controlling weight is not given to a treating source's opinions, the ALJ must consider the following "factors" in determining how much weight to give the opinions: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) whether the opinions are supported by relevant medical evidence or explanation; (4) whether the opinions are consistent with the record as a whole; (5) the specialization of the treating source with respect to the condition being treated; and (6) any other factors that may be

---

[2] The Social Security Administration recently adopted regulations that change the standards applicable to the review of medical opinion evidence for claims filed on or after March 27, 2017. *See* 20 C.F.R. § 416.920c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources. . . . [W]e will consider those medical opinions . . . together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."). Because Plaintiff filed her claim before March 2017, however, the Court applies the treating physician rule under the earlier regulations (20 C.F.R. § 416.927), and not under the more recent ones (20 C.F.R. § 416.920c).

significant. 20 C.F.R. § 416.927(c)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Treating source opinions may be rejected based on the ALJ's proper consideration of any of these factors, and the ALJ need not expressly recite each factor in his decision. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no . . . slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.") (citing *Halloran*, 362 F.3d at 31–32). Nonetheless, ALJs must give "good reasons" for the weight they assign to a treating source's opinions, 20 C.F.R. § 416.927(c)(2), and failure to do so is grounds for remand, *Halloran*, 362 F.3d at 33. Examples of "good reasons" to discount the opinions of a treating source are that the opinions are inconsistent with the substantial evidence of record, including the opinions of other medical sources, *see, e.g., Williams v. Comm'r of Soc. Sec.*, 236 F. App'x 641, 643–44 (2d Cir. 2007); the opinions are internally inconsistent, *see, e.g., Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012); the opinions are conclusory, meaning unsupported by clinical findings or other evidence, 20 C.F.R. § 416.927(c)(3); or the treating source lacked expertise in the relevant medical specialty, *id.* at (c)(5).

Here, the ALJ afforded "limited weight" to Dr. Warnken's opinions, on the following grounds: (1) the opinions are inconsistent with the other substantial evidence of record, including medically documented findings of Plaintiff's ability to maintain attention and concentration, record evidence of Plaintiff's ongoing ability to interact with others, the hearing testimony of medical expert Dr. Fuess, and the

opinions of multiple agency psychological consultants; (2) the opinions are not supported by Dr. Warnken's own specific findings noted upon examination; and (3) Dr. Warnken is a primary care physician, not a mental health specialist. (AR 1726–27; *see also* AR 1720, 1725.) By considering whether Dr. Warnken's opinions are consistent with the record, supported by medical findings, and made by a specialist in the relevant medical field (mental health); the ALJ clearly applied "the correct legal standard" in her analysis, *Machadio*, 276 F.3d at 108, as these are three of the five factors listed in the applicable regulation. *See* 20 C.F.R. § 404.1527(c)(3)–(5). Therefore, if these findings are supported by substantial evidence, the ALJ has not erred in affording limited weight to Dr. Warnken's opinions. In this context, "substantial evidence" is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). This is clearly a low standard that could allow for different supportable conclusions in many cases. *See Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) ("very deferential standard of review—even more so than the 'clearly erroneous' standard"). When there is substantial evidence to support both the ALJ's decision and a different result, the ALJ's decision must prevail. *Crowell v. Colvin*, 15 Civ. 2905 (PAE) (HBP), 2016 WL 5660405, at *5 (S.D.N.Y. Sept. 30, 2016), *aff'd sub nom. Crowell v. Comm'r*, 705 F. App'x 34 (2d Cir. 2017); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").

The Court finds that substantial evidence supports the ALJ's findings that Dr. Warnken's opinions are inconsistent with the other substantial evidence of record and unsupported by medical findings. Regarding the opinions' consistency with the record, in contrast to Dr. Warnken's opinion that Plaintiff could not concentrate for two-hour periods, many treatment notes from the alleged disability period indicate that Plaintiff had normal concentration and could do activities requiring concentration including reading and using a computer. (*See, e.g.*, AR 458 ("attention span and concentration appear good"), 698 ("normal attention span and concentration"), 721, 731, 1276 ("[a]ttention is gained"), 3109 ("has gotten books from the library and is reading quite a bit").) Moreover, in a June 2008 Neuropsychological Evaluation, Drs. Sheba Kumbhani and Laura Flashman found that "[Plaintiff's] overall level of intellectual functioning was estimated to be in the average range," with intact performances in memory, attention, and executive functioning tests. (AR 377.) The Evaluation stated that, although Plaintiff "endorsed severe symptoms consistent with depression and anxiety," she "demonstrated intact performance across multiple cognitive domains" and "performed in the average to high average range on numerous cognitive measures of executive function in the structured testing context." (AR 378.) Drs. Kumbhani and Flashman "strongly encouraged" Plaintiff to abstain from any substance use, to participate in substance abuse treatment services, and to "increas[e] structure and organization in her environment to facilitate maximum performance." (*Id.*) Other treatment notes similarly indicate that, when sober, Plaintiff was able to function cognitively. (*See, e.g.*, AR 2948, 3041, 3064, 3068, 3081

("[p]rognosis is good due to ongoing sobriety").)  For example, in an April 2010 Treatment Summary, Victoria Colvin, LICSW, LADC, stated that "[t]he focus of treatment is to support [Plaintiff's] ongoing abstinence efforts and stable emotional functioning," and that a risk factor for Plaintiff is "lack of adequate sober structure and support."  (AR 2672.)

Given these records, Dr. Fuess accurately testified that, "throughout th[e] record[,] the treatment notes are consistently reporting intact concentration and attention span."[3]  (AR 1788.)  Dr. Fuess also correctly stated that Dr. Warnken's opinions "state something different than what we're finding overall in the treatment records."[4]  (AR 1795.)  According to Plaintiff, the ALJ should not have relied on these treatment notes because they were made "with [Plaintiff's] doctor in a nurturing setting" rather than in a "competitive work setting."  (Doc. 34-1 at 25.)  But Dr. Warnken's opinions were also made based on his observations of Plaintiff in the same "nurturing" setting, rather than in a work environment.  Moreover, it is these

---

[3]  Of note, the medical expert at the earlier May 2013 administrative hearing, psychologist Dr. Koocher, similarly testified that Dr. Warnken's treatment notes "inconsistently documented" Plaintiff's depression and poor concentration, among other psychological symptoms, explaining: "I didn't find Dr. Warnken's records consistent or precise in terms of what one expects in a mental health diagnosis."  (AR 1696.)  In addition, at the January 2013 administrative hearing, Dr. Koocher stated: "Dr. Warnken checked things off and scribbled in a few words, but we don't have medical records to support that."  (AR 1748.)

[4]  Specifically, Dr. Fuess stated that Plaintiff suffered from polysubstance dependence, depressive syndrome, and anxiety disorder, but "has no more than moderate limitations" in her activities of daily living; social functioning; and concentration, persistence, and pace; and that her only episodes of decompensation related to substance abuse.  (AR 1786.)  Dr. Fuess noted that his review of the record revealed "intact cognitive functioning" for "simple, . . . routine types of tasks" (AR 1787); and "intact memory," "intact concentration and attention span," and "stable" social relationships" (AR 1788).  Dr. Fuess further noted that the record revealed that, as of April 2016, Plaintiff was "doing well," was "stable," and her "[p]rognosis [wa]s good due to ongoing sobriety."  (*Id.*)  The Doctor emphasized that, based on his review of the record: "[Plaintiff's] sobriety is a very significant factor in her recovery and stabilization."  (*Id.*)

15

types of objective observations made by treating medical providers on which ALJs must rely when determining how much weight to afford medical opinions, particularly when—as here—there are conflicting opinions.

Dr. Warnken's opinions that Plaintiff would not be able to effectively function when facing conflicts with coworkers or peers or when receiving criticism from supervisors, are also inconsistent with the record, which indicates that Plaintiff generally was able to effectively interact with others. Finding that Plaintiff had "moderate limitation" in interacting with others, the ALJ accurately explained that Plaintiff maintained ongoing relationships with family members, regularly spent time with others, effectively interacted with various treating or consulting medical providers, actively participated in both individual and group therapy sessions for treatment of her drug addiction, used public transportation, and regularly spent time at the library.[5] (AR 1717–18; *see, e.g.*, AR 731 ("appearance is appropriate," "[b]ehavior is described as unremarkable," "[a]ttitude is cooperative"), 779 ("[o]verall, she was cooperative and appeared motivated to perform well" in neuropsychological evaluation), 2091 (goes to the library on occasion), 2094 (uses public transportation), 2095 (goes to group therapy, counseling, and church on a regular basis), 2896 ("well

---

[5] The ALJ also noted a record indicating that Plaintiff was "going to Burlington Electric to advocate for herself" with regard to her electric bill." (AR 1718.) The record does contain a treatment note from the Howard Center which states that Plaintiff "is going to Burlington Electric to advocate for herself [regarding her high electric bill]." (AR 3104.) But Plaintiff correctly points out that the record does not indicate whether she did in fact go to Burlington Electric, and if she did, whether and how she "advocated for herself." (Doc. 34-1 at 17; *see* Doc. 38 at 1–2.) Plaintiff's point is well taken, but there is no error in the ALJ merely making note of the record, in conjunction with other records and in consideration of the record as a whole, given that the record does in fact state that Plaintiff intended to go to Burlington Electric to try to reduce her electric bill. (AR 3104.) The note is at least relevant to indicate that Plaintiff felt equipped to take that action, and her treating provider at the Howard Center did not feel that she was unable to complete such action.

groomed, good eye contact, full affect," "engaged and socially appropriate for session"),
3104 ("met with her son and stayed with other family members in Rutland,"
"reconnected with her father and brother"), 3182 ("taking a sailing trip with mother,
step[]father[,] and son"), 3209 ("increased visits to Rutland in order to spend more
time with father and [two] sons").)  Plaintiff claims that these activities are irrelevant
because they do not involve "stressful situations" like she would encounter in a work
environment.  (Doc. 34-1 at 17.)  But the ALJ recognized that Plaintiff would not be
able to handle much stress or public interaction in the workplace, including in her
RFC determination restrictions for only routine work requiring no more than three
steps, only incidental and superficial interaction with the general public, no fast-
paced or timed work, no strict quotas, only "routine day-to-day interactions with
others," and "few, if any, changes day[] to[] day."  (AR 1721.)

    The ALJ's finding that Dr. Warnken's opinions are unsupported by
examination findings is also supported by substantial evidence.  The ALJ explained:

> Dr. Warnken fails to note any specific findings (noted upon examination)
> to support his assessed limitations.  A review of his treatment notes . . . ,
> while revealing evidence of [Plaintiff's] own subjective reports of her
> symptoms and limitations . . . as well as evidence of multiple PHQ9 forms
> completed by [Plaintiff], fails to reveal evidence of medically documented
> findings noted upon examination consistent with the extent of [Dr.
> Warnken's] assessed limitations.

(AR 1727.)  The record supports this analysis: despite Dr. Warnken's opinion that
Plaintiff was unable to do any kind of work as a result of her mental impairments, the
objective examination sections of Dr. Warnken's treatment notes generally indicate
no mental abnormalities, and often record normal findings or state "no unusual

anxiety or evidence of depression."[6]  (*See, e.g.*, AR 481, 485, 519, 734, 744, 1403, 1651, 2744, 2788, 2839.)

The ALJ also correctly considered that Dr. Warnken is a primary care physician, not a mental health provider.  (AR 1727.)  This factor is relevant, given that Dr. Warnken's opinions address Plaintiff's mental health, an area in which Dr. Warnken does not specialize; and the regulations provide that the ALJ must "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(c)(5).  The ALJ looked to the opinions of several mental health specialists—including medical expert Dr. Fuess and five agency psychological consultants—in assigning limited weight to Dr. Warnken's opinions, giving "[g]reat" and "[s]ubstantial" weight to the opinions of Dr. Fuess and the mental health consultants.  (AR 1719; *see* AR 1727–28; *see also* AR 487–99 (J. Coyle, PhD), 629 (William Farrell, PhD), 633–34 (Richard Winslow, MD), 1848–62 (Jan Jacobson, PhD), 1864–78 (Edward Schwartzreich, MD).)  The ALJ explained that Dr. Fuess and the agency consultants were experienced in assessing mental impairments and were given the opportunity to review all of Plaintiff's medical records; and that the opinions of Dr. Fuess and the agency consultants are "consistent with each other and with the evidence of record as a whole, including[] medically

---

[6]  Also noteworthy, at the January 2013 administrative hearing, Dr. Koocher testified that he "[could not] tell from the record" how Dr. Warnken reached the conclusions he reached in his opinions. (AR 1748.)  Dr. Koocher explained: "The problem with Dr. Warnken's notes is that we don't have a lot of narrative. . . .  We're not seeing any narrative report about what he's working on with her in therapy . . . .  We're not seeing reports that [Plaintiff] . . . was unable to do something with her peers.  [Dr. Warnken] is not reporting those things."  (AR 1753.)

documented findings noted throughout [Plaintiff's] treatment records and evidence of record with regard to her overall level of activity during the period under review."[7] (AR 1719–20.)

Although Dr. Warnken was Plaintiff's treating physician during the alleged disability period, and Dr. Fuess and the agency consultants were testifying or consulting psychologists/psychiatrists who never examined or treated Plaintiff, the ALJ was entitled to afford more weight to the opinions of Dr. Fuess and the agency consultants than to those of Dr. Warnken if the former are more consistent with the record than the latter. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record.") (citing *Schisler*, 3 F.3d at 567–68); *see also* SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."). For the reasons stated above and by the ALJ in his decision, the opinions of Dr. Fuess and the agency consultants are in fact more consistent with the record than those of Dr. Warnken.

---

[7] As an example of the agency consultant opinions, agency consultant Dr. Coyle opined as follows in October 2008: Plaintiff could "sustain att[ention]/conc[entration] for routine tasks[,] and maintain effort for extended periods of time over the course of a normal work day/week in a setting that does not require adherence to strict time and productions quotas" (AR 503); Plaintiff's "[s]tress tolerance is acceptable for a routine and stable work setting with minimal external distractions" (*id.*); Plaintiff "is able to engage in brief[,] superficial interactions on an individual basis" and "is capable of typical interactions with coworkers and supervisors while completing routine tasks" (*id.*); and Plaintiff could "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" (AR 501). The Court rejects Plaintiff's argument in her reply brief that these opinions of Dr. Coyle are "not contradictory" to Dr. Warnken's opinions. (Doc. 38 at 3.) Dr. Warnken's opinions (*see, e.g.*, AR 835, 1527, 2888) clearly include more severe restrictions on Plaintiff's ability to function in a work environment than do the opinions of Dr. Coyle and the other agency consultants.

Plaintiff argues that Dr. Warnken's opinions are consistent with those of treating therapist Colvin (AR 2672, 2691–97) and treating substance abuse counselor W.C. (Connie) Norona, LADC (AR 3283). As the ALJ recognized (*see* AR 1727), even though these providers are not considered "acceptable medical sources" under the regulations, 20 C.F.R. § 404.1513(a), (d) (2015), the ALJ was required to consider and analyze their opinions "on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file," SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006)[8]; and the same factors should be used to evaluate these opinions as are used to evaluate opinions from "acceptable medical sources," *id.* at *4 (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)). The ALJ did in fact consider the opinions of therapist Colvin and counselor Norona using those factors (*see* AR 1720, 1727), but reasonably afforded "less weight" to them than to the opinions of Dr. Fuess, on the proper grounds that: (1) Dr. Fuess had a "greater level of medical expertise in assessing mental impairments" and "was given [the] opportunity to review all of [Plaintiff's] medical records"; and (2) the opinions of Colvin and Norona were inconsistent with the record, including "[Plaintiff's] own acknowledged ability to: read 'quite a bit'; watch television; use public transportation[;] . . . participate in a knitting group . . . [;] travel to visit her children and father; . . . regularly visit the local library; . . . go on a sailing trip; and . . . participate in . . . therapy and other activities offered

---

[8] The Social Security Administration rescinded SSR 06-03p, effective March 27, 2017. 82 Fed. Reg. 15263–01 (Mar. 27, 2017). The SSR still applies here, however, given that Plaintiff's claim was filed in August 2008, well before March 2017.

by the Howard Center." (AR 1727; *see, e.g.*, AR 2091, 2095, 3109, 3182, 3209.)

Substantial evidence supports these findings.

The Court therefore finds no error in the ALJ's allocation of great weight to the opinions of Dr. Fuess and the agency consultants and limited weight to the opinions of Dr. Warnken and other treating providers.

## II. ALJ's Consideration of Plaintiff's Need for Frequent Treatment

Next, Plaintiff claims that the ALJ should have considered Plaintiff's need for frequent treatment, including "regular therapy sessions and doctors' appointments," in determining her RFC. (Doc. 34-1 at 27.) More specifically, Plaintiff argues that the ALJ "failed to consider the evidence of [her] extensive therapy sessions which clearly caused a disruption of her routine to the point that it would significantly interfere with her ability to sustain any gainful activity." (*Id.*)

The Court recognizes that a relevant factor in determining a claimant's RFC is the ability to work a consistent schedule on a continuing basis. *See* SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) ("Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a *regular and continuing* basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." (first emphasis omitted)). Thus, Plaintiff's need for frequent therapy and other treatment or appointments is relevant to the ALJ's RFC determination. The Court finds, however, that substantial evidence does not support Plaintiff's claim that the ALJ erred in

failing to consider her need for frequent treatment in determining her RFC. The ALJ did in fact summarize and discuss Plaintiff's frequent treatment, including mostly her therapy sessions, in detail in her decision. (*See* AR 1714–20, 1722–27.) But none of the mental health doctors on whose opinions the ALJ properly relied, as discussed above, opined that Plaintiff would be excessively absent from work due to her symptoms. (*See, e.g.*, AR 503, 629, 633–34, 1797, 1860, 1875–76.) Dr. Fuess specifically disagreed with Dr. Warnken's opinion that Plaintiff would be absent from work "about one-quarter of the time," finding this opinion to be inconsistent with the record. (AR 1797.)

Furthermore, Plaintiff has failed to demonstrate that she would be unable to schedule her required treatment visits around a full-time work schedule. To the contrary, notes from Plaintiff's appointments at the Howard Center indicate that the clinic encouraged Plaintiff to work or volunteer, and would schedule her appointments around those activities, if necessary. (*See, e.g.*, AR 3164 (Plaintiff "reminded [that] she needed to be engaged in some type of volunteer position, employment[,] or other prosocial activities," in order to reinstate her "take[-]home privileges").) Other notes from the Howard Center reveal that the clinic was willing to allow Plaintiff to miss or cancel appointments for other reasons as well. (*See, e.g.*, AR 3006, 3182, 3209.)

The Court therefore finds no support for Plaintiff's argument that the ALJ failed to consider Plaintiff's need for frequent treatment.

### III. Plaintiff's Cross-Examination of Medical Expert Dr. Fuess at Hearing

Finally, Plaintiff contends that the ALJ should have ensured that Plaintiff's representative had a full opportunity to cross-examine medical expert Dr. Fuess at the October 2016 administrative hearing. Plaintiff further claims that "[a]dditional cross[-]examination of Dr. Fuess was critical" (Doc. 38 at 6), and that she "should not be deprived of a right to examine a critical witness due to act[ions] attributable to the hearing administration" (*id.* at 7).

Although the record reveals that Dr. Fuess left the hearing earlier than expected (*see* AR 1796, 1798), there is no evidence that Plaintiff's representative required further questioning of Dr. Fuess. Before the ALJ dismissed Dr. Fuess from the hearing, Plaintiff's representative had questioned the Doctor in some detail, inquiring about evidence that the representative believed supported a finding of disability, while Dr. Fuess explained his reasons for finding otherwise. (*See* AR 1788–98.) When Dr. Fuess stated that he had time for only one more question, and the ALJ asked Plaintiff's representative if she had "more than just one [final] question" for Dr. Fuess, Plaintiff's representative stated, in relevant part: "I just think that there are mental status exams, and that's throughout the record that do support Dr. War[nken]'s opinion." (AR 1798.) There is no reason to believe that Plaintiff's representative's questioning Dr. Fuess about these "mental status exams" would have changed Dr. Fuess's opinions, given his testimony that he had reviewed all the evidence in the record prior to testifying about his opinions. (*See* AR 1784, 1795–96.) Moreover, Plaintiff's representative did not object to Dr. Fuess's departure

at that time, nor did she not state any other question(s) that she wanted to ask him, despite Dr. Fuess's statement that he could answer "one more question." (AR 1798.) It appears from the record that Plaintiff's representative likely could have asked another question of Dr. Fuess, given that the Doctor fielded a final question from the ALJ before departing. (*See* AR 1799.)

## Conclusion

For these reasons, the Court DENIES Plaintiff's motion (Doc. 34), GRANTS the Commissioner's motion (Doc. 35), and AFFIRMS the Commissioner's decision. The Clerk shall enter judgment on behalf of the Commissioner.

Dated at Burlington, in the District of Vermont, this 30th day of August 2018.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge